

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 6, 2023

**BY ECF**

The Honorable John P. Cronan
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Ramila Sardarova*, S1 20 Cr. 681 (JPC)

Dear Judge Cronan:

    The defendant in this case, Ramila Sardarova, is scheduled to be sentenced on March 13, 2023 at 10:00 a.m., having pled guilty to wire fraud, in violation of 18 U.S.C. § 1343. The Government respectfully submits this letter in advance of sentencing. For the reasons explained below, the Government believes that a sentence of not less than 48 months' imprisonment would be appropriate in this case.

**I.**    **Background**

    **A.  Offense Conduct**

    The defendant took part in a lengthy, wide-ranging scheme to steal more than approximately $100 million from Medicaid and other health care benefit programs.

    Home care is a health service provided in a patient's home to assist patients in recovering from or living with disabilities and other health conditions. Health care benefit program beneficiaries in New York State may seek publicly funded home health and personal care services through managed long-term care plans ("MLTCs"). Home care agencies staff home care cases for approved patients associated with certain MLTCs. The MLTCs then pay the agencies a certain hourly rate for the approved care periods, and the MLTCs are in turn reimbursed by federal and state health care funds.

    In recent years, spending on home care in New York State has risen significantly. In January 2020, New York State's budget director announced that state spending on MLTCs tripled between the 2013 and 2019 fiscal years, representing an increase of $4.8 billion.

    The cost of this care is staggering in New York State and New York City. New York State's Medicaid program spends approximately $12 billion per year on home care, almost as much as the rest of the country combined. *See* Bill Hammond, *Long Term Crisis: The Case for*

*Reforming Medicaid 'Personal Care' in New York*, https://www.empirecenter.org/wp-content/uploads/2022/11/Long-Term-Crisis-final.pdf. "The state's per capita personal care spending is eight times higher than the national average." *Id.* And, New York City employs 236 home care aides for every 1,000 residents, well above the national average. *Id.* More New Yorkers work as home care aides than the combined total of those working in retail or fast food. *Id.* In addition, spending on home care increased by more than 178% between 2015 to 2021, which was 1000% faster than the growth of the States' elderly population. *Id.*

Beginning in at least approximately 2015, massive fraud involving home care began to be perpetrated at a home care agency, headquartered in Brooklyn and operating across New York City ("Agency-1"). During all relevant periods, Agency-1 had the same owner ("Owner-1") and defendant Marianna Levin worked as a functional second in command. In or about 2016, Owner-1 and Levin established a second Brooklyn-based agency ("Agency-2" and, together with Agency-1, the "Agencies"). Levin served as the formal owner of Agency-2 although she retained her substantial responsibilities at, and time commitment to, Agency-1.

The Agencies were closely affiliated, sharing staff, aides and patients. Owner-1 and Levin utilized the two Agencies to try to evade state overtime laws, attempting to split cases for particular patients across the two Agencies so that individual aides worked fewer than 40-hour weeks at each Agency.

Together, the Agencies employed at least approximately 3,000 aides. From approximately 2015 through December 2020, the Agencies billed MLTCs for approximately $378 million in home care services.

The defendants worked together to advance a huge fraud scheme at the Agencies. The scheme had several components, although its overarching goal was to fraudulently boost the billings at the Agencies, primarily to the benefit of Owner-1 and Levin.

The primary method through which the scheme operated was through "no-show" arrangements. In these cases, the Agencies would staff and bill for home care arrangements where no actual (or substantially fewer) home care services were provided. The assigned aide and purported patient would split the payment flowing to the aide. And, rather than working, the aide might be vacationing or shopping when he or she was otherwise required to work. The Agencies benefited by collecting profit on every additional hours of care purportedly provided. A significant portion of the Agencies' billings were fraudulent.

Participants in this scheme paid kickbacks to obtain and keep no-show cases. The Agencies also paid cash "bonuses" to those who referred new cases to the Agencies. The Agencies jealously guarded their book of business in the competitive home care industry, employing a set of carrots and sticks to keep as many patients at the Agencies as possible.

In addition to the no-show scheme, the Agencies also engaged in fraud concerning New York State's Consumer Directed Personal Assistance Program ("CDPAP"). CDPAP allowed patients to select their own aides, including family members. Given the nature of these

Hon. John P. Cronan
March 6, 2023
Page 3 of 7

arrangements, CDPAP cases were prone to the no-show cases that permeated the Agencies. However, in addition to straightforward no-show arrangements, CDPAP cases were also reimbursed at lower rates than typical home care cases, which involve aides with training and licensing. As a result, in order to fraudulently boost billing, at Owner-1's and Levin's direction, employees at the Agencies fraudulently converted CDPAP cases into conventional cases that could be billed at higher rates. This required CDPAP aides to obtain Home Health Aide ("HHA") certificates. Unlike CDPAP, HHA aides are not allowed to provide services to family members. The Agencies would "swap" CDPAP cases on paper, so it would appear that former family CDAP aides began providing HHA services to strangers, but in reality, the aides would continue attending (or not) to their family members but with the Agencies collecting higher billings.

These fraud schemes were supported by the Agencies and their employees. Notably, the coordinator position was particularly important in managing these fraud schemes, as coordinators were responsible for keeping things running smoothly with the Agencies' cases, ensuring that the Agencies could collect maximum reimbursements. This included ensuring that cases always had aides assigned to them and obtaining replacement "aides" to fill gaps in a no-show case's schedule.

Sardarova worked as a case coordinator at Agency-1, where she oversaw aides, including a large volume of no-show aides, and facilitated kickback payments. The vast majority of cases on Sardarova's docket were fraudulent because, as discussed below, Sardarova recruited hundreds of no-show cases to the Agencies. Sardarova often found no-show aides for her no-show cases. In some cases, Sardarova procured fraudulent home health aide certificates for the aides she recruited and her colleagues. Specifically, in exchange for a cash fee, Sardarova was able to obtain home health aide certificates for people without them attending the required training classes.

Sardarova was a prolific recruiter of no-show cases at the Agencies. Multiple cooperating witnesses have confirmed that Sardarova recruited hundreds of no-show cases to the Agencies. This account is corroborated by contemporaneous recorded conversations of co-defendants. For example, in a June 2019, recorded conversation between co-defendant Tetyana Golyak and a cooperating witness ("CW-1"), Golyak said, "I'm telling you, she [Sardarova] had built an empire for herself in a way where her patients themselves work as marketing." Likewise, in another June, 2019 recorded conversation, Golyak explained that "if she [Sardarova] sells all her cases, she can live to the end of her days without worrying about a thing . . . ."

As a top recruiter, Sardarova enjoyed a special relationship with Levin and Owner-1. Sardarova became close to both Owner-1 and Levin and was able to communicate with them directly (as opposed to communicating through mid-management, like everyone else). For each case she recruited, the defendant was paid approximately $500 by the Agencies.

### B. Procedural History

On December 15, 2020, a grand jury returned Indictment S1 20 Cr. 681 (JPC), charging Sardarova and eleven others for their involvement in the fraud scheme at the Agencies.

Hon. John P. Cronan
March 6, 2023
Page 4 of 7

On September 15, 2022, Sardarova pled guilty to wire fraud. Pursuant to the parties' plea agreement, the parties stipulated that the offense level is 26 and the defendant's Criminal History Category is I, resulting in a Guidelines Range of 63 to 78 months' imprisonment. The Probation Office calculates the same Guidelines Range.

## II.  Discussion

### 1. Applicable Law

Following *United States v. Booker,* 543 U.S. 220 (2005) and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker,* 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## 2. A Sentence of At Least 48 Months Is Sufficient and Not Greater Than Necessary

A sentence of at least 48 months' imprisonment is appropriate but not greater than necessary to comply with the purposes of sentencing.[1] The factors most relevant to imposing sentence include the seriousness of the defendant's offense, the need to promote respect for the law, and the need to afford adequate deterrence to criminal conduct.

The conduct at issue is indisputably serious. The defendant took part in a broad conspiracy to defraud state and federal health care programs. The defendant directly took part in the no-show scheme as one of the top recruiters of no-show cases. She was also an office worker at Agency-1, a coordinator who was aware of and supported a high volume of no-show cases. The defendant engaged in the criminal activity for five years and was an integral component of its success.

The fraud scheme at the Agencies was staggering and is part of a broader story of fraud and abuse in the home care industry. The Agencies billed tens of millions of dollars in fraud that related to no-show and other artificially inflated cases. And, as described in greater detail in Bill Hammond's *Long Term Crisis* report, the costs and breadth of fraud inflating costs for U.S. and New York taxpayers cannot be ignored. *See* https://www.empirecenter.org/wp-content/uploads/2022/11/Long-Term-Crisis-final.pdf. It is actually the type of arrangements that were so prevalent at the Agencies that has led to New York's homecare costs so quickly and dramatically outpacing the nation and what could reasonably be expected.

This fraud scheme also harms legitimate patients. According to information from cooperating witnesses, some no-show patients have a legitimate need for care but choose to participate in fraud for the easy cash. Moreover, the need to respond to fraud results in structural changes that makes it more difficult and time consuming to access necessary care. The Agencies' crimes are an important piece of the broad societal harm that flows from health care fraud and entirely in line with the statutory imperative to firmly combat such frauds.

This serious crime requires a sentence commensurate with the offense to the public.

General deterrence and the need to promote respect for the law are also significant concerns supporting the Government's position. The no-show fraud scheme is incredibly common in the home care industry and is perpetrated at many agencies in New York City beyond the Agencies that are the object of the Indictment. According to information from cooperating witnesses, most conspirators did not fear law enforcement detection and believed that those who were eventually caught would not face meaningful consequences. Serious, incarceratory, sentences for the Agencies' employees who promoted and profited from the fraud scheme is essential to convey that these costly fraud schemes carry a serious cost and will be harshly dealt with. General deterrence

---

[1] To be sure, a sentence within the stipulated Guidelines range of 63 to 78 months' imprisonment would be appropriate given the defendant's serious and prolonged conduct. However, given that co-defendant Marianna Levin, who was more culpable in the scheme, was sentenced to 54 months, the Government believes that a sentence of at least 48 months is appropriate.

is especially needed for recruiters, like the defendant, who play an important and necessary role in the success of these types of fraud schemes.

As is clear from this case, it is all too easy to do what the defendants did, all too attractive, and all too difficult to detect until the fraud has reached a massive scale. This means that a meaningful sentence is warranted. *See, e.g.*, *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (alteration in original)); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

The Government disagrees with the defendant's contention that mere arrest and conviction achieve the goal of general deterrence. To the contrary, lenient sentences in this case would only promote more fraud. As discussed above, most conspirators did not fear meaningful punishment if they were caught. Indeed, even after the arrests in this case, many defendants were assured that they would not face serious consequences, according to a cooperating witness. That type of mentality has allowed rampant fraud in the home health industry to fester, costing taxpayers an untold amount of money. Serious jail sentences are necessary to send a message to individuals willing to engage (or who are currently engaged) in similar fraud schemes.

The defendant also appears to minimize her involvement in the conspiracy. The defendant claims that knowledge of fraud "dawned on her gradually," and while her "caseload was higher than some other coordinators, . . . her day-to-day job was the same," suggesting the loss amount attributable to her is the result of mere happenstance. (Dkt. No. 381 at 5, 8.) This argument overlooks the defendant's role as a key recruiter of no-show cases. As one of the top recruiters at the Agencies, the defendant was directly responsible for a high volume of losses. Moreover, the defendant had intimate knowledge that the no-show cases she recruited (and oversaw as a coordinator) were fraudulent.[2] The defendant was not a mere bystander; she knowingly played a key role in the massive scheme.

---

[2] The defendant would have known the fraudulent nature of the cases she recruited based on, among other things, the conversations she had with the individuals she recruited, information learned during intake, and her daily work overseeing the cases she recruited. Moreover, the Government understands from multiple cooperating witnesses that the defendant did not want to oversee legitimate cases because they require more oversight work. This was a point of contention between the defendant and management.

The Government also disagrees with the defendant's argument that she is "substantially less culpable than Levin and similarly situated to Marupova and Kuptsova."[3] (Dkt. No. 381 at 8.) While the Government agrees that Levin – the owner of Agency-2 and second-in-command at Agency-1 – is more culpable, the defendant's level of culpability is much closer to Levin than Marupova or Kuptsova. The defendant participated in a key role in the fraud scheme for more than five years. As a top recruiter of no-show cases, the defendant had a direct role in generating large losses. And she was remunerated for each case she recruited. As the coordinator for most of the cases she recruited, the defendant played a role in facilitating the scheme on a daily basis. Kuptsova, in stark contrast, recruited no patients and oversaw a far smaller volume of no-show patients. With the possible exception of Tetyana Golyak (who was the supervisor of coordinators at Agency-1), the Government views Sardarova as the most culpable defendant left to be sentenced.

Nevertheless, despite the aggravating factors in the defendant's case, the need to avoid unwarranted sentencing disparities underpins the Government's sentencing recommendation. Sardarova is less culpable than Levin and should not be sentenced the same. She should, however, receive a sentence of at least 48 months considering the seriousness, pervasiveness, and harm of her conduct.

### III.   Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence if at least 48 months' imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:   /s/
Nicholas W. Chiuchiolo
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-1247/-2486

---

[3] The Government also disagrees with the defendant's contention that the stipulated Guidelines range holds her responsible for "all of the agency's fraudulent billings." (Dkt. No. 381 at 9.) The stipulated Guidelines range is based on a reasonable estimate of the losses that were foreseeable to the defendant. While the defendant, similar to Levin, had more visibility into the scope of the scheme than most of the other participants, she did not have full visibility; the total loss amount exceeds $100 million.